# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Kevin Smith, #164920, (a/k/a Bar-None-Royal Blackness, | ) ) ) | CIVIL ACTION NO. 9:07-3644-PMD-BM |
| Plaintiff, | ) ) | |
| v. | ) ) | **REPORT AND RECOMMENDATION** |
| Jon E. Ozmint; Robert E. Ward; E. Sligh; John Lunden; David Tatarski; Bernard McKie; Vaughn Jackson; Gary Lane; Charles Amaker; J. Peck; Glen Alewine; William Litrell; Ned Cooper; Larry Kong, of American Amenities, Inc.; American Amenities and Brent A. Mills, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This is a civil action filed <u>pro se</u> by a state prison inmate who has struck out under the three-strikes rule of the Prison Litigation Reform Act (PLRA). <u>see</u> 28 U.S.C. § 1915(g). Plaintiff's original forty nine page complaint, filed pursuant to 42 U.S.C. § 1983, contained allegations concerning the conditions of his confinement in the maximum security unit (MSU) at the Kirkland Correctional Institution (KCI). However, given Plaintiff's "struck-out" status, the only claims Plaintiff was allowed to pursue were his allegations about no sunlight in the MSU, about the Department of Corrections allegedly giving prisoners Chinese made hygiene products that contain chemicals found in anti freeze, about sleep deprivation caused by twenty four hour lights and noise created by mentally ill fellow inmates, and about the hallways and Plaintiff's cell being covered in mold. <u>See</u> Court Docket Nos. 14, 53.

By Order filed March 12, 2009, Larry Kong and American Amenities, Inc. were

1



dismissed as party Defendants in this case. <u>See</u> Court Docket No. 174. The Defendant Brent Mills filed a motion for summary judgment pursuant to Rule 56 Fed.R.Civ.P., on September 11, 2008. As the Plaintiff is proceeding <u>pro se</u>, a <u>Roseboro</u> order was entered by the Court on September 16, 2008, advising Plaintiff of the importance of a motion for summary judgment and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendant's motion may be granted. After receiving an extension of time to respond, Plaintiff filed a memorandum in opposition to Mills' motion for summary judgment on November 3, 2008, as well as his own motion for summary judgment against this Defendant. Mills filed a reply memorandum on November 5, 2008.

The remaining Defendants then filed their own motion for summary judgment on November 20, 2008, following which another <u>Roseboro</u> order was entered on November 24, 2008. Plaintiff thereafter filed a memorandum in opposition to this motion on December 22, 2008. These motions are now all before the Court for disposition.[1]

### Background and Evidence

Plaintiff alleges in his verified complaint[2] that he is a state prisoner housed in the maximum security unit (MSU) of the Kirkland Correctional Institution. With respect to the claims

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendants and Plaintiff have all filed motions for summary judgment. As these are dispositive motions, this Report and Recommendation is entered for review by the Court.

[2]In this Circuit, verified complaints by <u>pro se</u> prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991). Plaintiff has filed a verified Complaint. Therefore, the undersigned has considered the factual allegations set forth in the verified Complaint in issuing a recommendation in this case.



which have been allowed to go forward, Plaintiff alleges that the Defendants have shown deliberate indifference toward his health and safety through the distribution of contaminated hygiene products ("Spring Fresh" toothpaste and deodorant) imported from China. Plaintiff alleges that these products contain poisonous chemicals used in antifreeze, and further alleges that the Food and Drug Administration (FDA) has issued a nationwide consumer health alert warning all U. S. Citizens to discontinue the use of toothpaste and hygiene products from China. Plaintiff alleges that he put the Defendant Ward on notice of this problem through submission of a Request to Staff Member Form on June 6, 2007, and put the Defendant Lunden on notice through a Request to Staff Member Form submitted July 11, 2007. Plaintiff further alleges that at all times prior to the filing of the complaint, the Defendant Peck had first hand knowledge of the contaminated "spring fresh" hygiene products but that he continued to distribute these products via the prison commissary. Plaintiff alleges that due to the Defendants' actions, as of July 17, 2007 he had to receive medical treatment for rashes and swelling on his body, as well as for a swollen tongue due to the long term usage of the contaminated "spring fresh" hygiene products. See generally, Plaintiff's First Cause of Action.

Plaintiff also alleges that he is kept in a controlled strip cell which is illuminated twenty-four hours a day. Plaintiff alleges that after a physical altercation with an officer that took place on February 4, 2006, Plaintiff was confined to Cell D-50 for five months (February through July 2006) with the lights kept on twenty-four hours per day inside the cell per order of the Defendant Jackson, causing Plaintiff severe sleep deprivation. Plaintiff alleges that this has interfered with his sleep cycle, and has resulted in extreme physical and psychological harm to him. See generally, Plaintiff's Third Cause of Action. Plaintiff also alleges that mentally ill prisoners are constantly screaming and banging loudly in their cells, contributing to Plaintiff's sleep deprivation. See generally, Plaintiff's Fifth Cause of Action.



Plaintiff also alleges that the hallways of the maximum security unit are always filthy and contain mold, creating a serious health and safety hazard in the form of bacteria and germs. Plaintiff alleges that since the maximum security prisoners' meal trays come through the hallway area of the unit, they are exposed to this bacteria and mold, placing prisoners at serious risk of harm. Plaintiff also complains about mold in his cell, to which he is confined twenty-three to twenty-four hours per day, and that his cell also contains peeling paint and asbestos. Plaintiff alleges that the Defendants Ozmint, Ward, McKie, Lane and others are responsible for these conditions. See generally, Plaintiff's Thirteenth Cause of Action.

Finally, Plaintiff alleges that he is being "deprived [of] any form of sunlight inside [his] cell . . . .". Plaintiff again states that he is confined in his cell twenty-four hours a day, and that he needs sunlight to sustain his health and well being. Plaintiff alleges that McKie had steel plates welded to the "inside-outside" of each prisoner cell, thereby preventing any sunlight from entering the cell. Plaintiff alleges that this condition has led to his mental and physical deterioration. See Generally, Sixteenth Cause of Action. Plaintiff seeks certain declaratory and/or injunctive relief, as well as monetary damages.[3]

In his motion for summary judgment, the Defendant Mills argues that he should dismissed as a party Defendant because Plaintiff has only claimed that he provided improper medical treatment following an incident where Plaintiff was allegedly sprayed with pepper spray and assaulted by a corrections officer, and that since that cause of action (Plaintiff's Second Cause of Action) as well as Plaintiff's Ninth Cause of Action (which generally discussed the prison's medical staff) have both been dismissed by previous order of this Court, he is entitled to dismissal as a party

---

[3]All of the remaining causes of action in the complaint have been dismissed. See Orders filed April 23, 2008 and May 16, 2008 (Court Docket Nos. 53 and 75).



Defendant. In his response to this Defendant's motion for summary judgment as well as in his own motion for summary judgment, Plaintiff does not dispute that the actions for which he seeks liability against the Defendant Mills derive from claims in his complaint which have already been dismissed. Therefore, Mills is entitled to dismissal as a party Defendant.

With respect to the remaining Defendants, in support of summary judgment in the case the Defendant Alewine had submitted an affidavit wherein he attests that he is a physician licensed to practice medicine in the state of South Carolina, and is employed by the South Carolina Department of Corrections as the medical director. Alewine attests that he has reviewed Plaintiff's medical records with regard to his allegations of sleep deprivation, mold contamination, deprivation of sunlight, and contaminated toothpaste and deodorant/antiperspirant products, which are attached to his affidavit as Exhibit A. Alewine attests that he has also reviewed the original notice made available on-line in 2007 by the Federal Food and Drug Administration regarding the possible presence of Diethylene Glycol (DEG) in certain brands of toothpaste manufactured in China. Alewine attests that the toothpaste provided to the Plaintiff ("spring fresh") was not among those toothpastes identified by the FDA as possibly containing Diethylene Glycol, and a review of Plaintiff's medical records shows no indication that Plaintiff has suffered any injury as a result of exposure to, or ingestion of, the "spring fresh" toothpaste. Alewine further attests that, while Plaintiff has repeatedly complained to medical that he believes he has been poisoned by the toothpaste, physical examinations and laboratory tests fail to indicate any abnormalities. Alewine attests that, within a reasonable degree of medical certainty, there is no evidence in Plaintiff's medical records to indicate that he has sustained any injury that could reasonably be medically related to his allegations of exposure to Diethylene Glycol, nor is there any medical indication that Plaintiff has even been exposed to Diethylene Glycol while housed at the South Carolina Department



of Corrections.

With respect to Plaintiff's allegations of skin irritation following the use of the "spring fresh" brand of deodorant/antiperspirant, Alewine attests that it is not uncommon for individuals to have skin reactions to antiperspirants or deodorants, and that skin irritation with the application of these products is not confined to certain brands or ingredients. Further, the skin irritation described by the Plaintiff is not a serious or life threatening problem, with the irritation associated with these events typically resolving in a short period of time following the discontinuation of the use of the deodorant/antiperspirant. Further, Alewine attests that Plaintiff's medical records show that his alleged skin irritation was very minor and was not, in Alewine's professional medical judgment, a serious disorder. Plaintiff's medical records further show that he received a topical treatment for his complaints.

With respect to Plaintiff's complaints that he is being deprived of sleep because of lighting in his cell, Alewine attests that Plaintiff's medical records show that he has a history of complaints related to his ability to sleep, and that as long ago as 2003, Plaintiff was alleging that he was having trouble sleeping due to nightmares. However, Alewine attests that there is no evidence that Plaintiff has any signs or symptoms consistence with chronic sleep deprivation. Further, Plaintiff's medical records reflect that he has repeatedly refused to communicate with the mental health counselors, but that even despite Plaintiff's general refusal to communicate with these counselors, there are medical notes indicating that Plaintiff was suffering from no abnormal affect or apparent distress, nor is there any indication that Plaintiff is suffering from any diagnosed mental health disorder.

With respect to Plaintiff's complaints about mold in the MSU, Alewine attests that he can find no medical indication in Plaintiff's records to show that he has been exposed to abnormal

6



or hazardous amounts of mold, nor did his medical records reveal any evidence of any malnutrition associated with any alleged reduced exposure to sunlight.  Alewine attests that, overall, Plaintiff's medical records demonstrate that he is not suffering from any serious medical or mental health disorder, and that he appears to be healthy and in no apparent distress.  See generally Alewine Affidavit with attached Exhibit [Medical Records and FDA News Release].

The Defendants have also submitted an Affidavit from Bryant Diehl, who attests that he is the Canteen/Commissary Branch Chief for the South Carolina Department of Corrections, and is generally responsible for the supervision of the overall operation of the canteen and commissary services.  With respect to toothpaste and deodorant, Diehl attests that these products are supplied to indigent inmates by the Department of Corrections for their personal hygiene at no cost.  Inmates are also able to purchase these items and other supplies from canteen services.  Diehl attests that items in the hygiene packages purchased by the Department of Corrections come from reputable distributers who are regularly engaged in the sale and distribution of these items.

Diehl attests that at the end of June or beginning of July 2007, he was contacted regarding allegations of possible issues with the toothpaste being provided to inmates as part of their indigent hygiene packages.  The toothpaste was the "spring fresh" brand distributed by American Amenities.  Diehl attests that prior to that time, no one had informed him of any allegations regarding the "spring fresh" toothpaste, and that upon hearing these allegations, he and his staff reviewed the notice provided by the FDA on their website and confirmed that the "spring fresh" brand toothpaste was not listed on that advisory as being potentially contaminated.  Diehl attests that the Department of Corrections also contacted American Amenities and was assured that, while the toothpaste was manufactured in China, it did not contain Diethylene Glycol and was not part of the FDA advisory. Further, the labeling on the "spring fresh" tube does not list Diethylene Glycol as being an ingredient.

7



Nonetheless, Diehl attests that, after consideration of this issue, the Department of Corrections determined that the continued distribution of the "spring fresh" brand toothpaste would likely result in additional complaints and lawsuits by inmates merely because it was labeled as a product of China, so the various institutions were asked to return all the toothpaste in their possession to the central commissary facility. Diehl attest that the "spring fresh" toothpaste was to be substituted and replaced by "Nature Mint" toothpaste from India.  Diehl also attests that, while Plaintiff alleges in his Complaint that he received an additional tube of "Spring Fresh" toothpaste after the Department had recalled the tubes for substitution, had Plaintiff made a complaint to the commissary, that tube would have been replaced with a tube of the "Nature Mint" toothpaste.  In any event, Diehl attests that he is not aware of any scientific testing by the Department to determine whether any of the individual "Spring Fresh" toothpaste tubes contained any level of contamination by Diethylene Glycol, nor does he have any personal knowledge of any such contamination in any toothpaste that was provided to the Department of Corrections.

   With respect to Plaintiff's complaints regarding the presence of Propylene Glycol in the "Spring Fresh" brand antiperspirant/deodorant stick, and Plaintiff's allegation that Propylene Glycol is converted to alcohol when the product is used, or that the deodorant actually contains alcohol, Diehl attests that the label of the antiperspirant/deodorant stick specifically states that it is alcohol free.  Diehl attests that the absence of alcohol in the antiperspirant/deodorant stick provided to inmates is an important interest to the Department of Corrections since the Department specifically prohibits the introduction of alcohol into the institutions and possession of alcohol by inmates is considered contraband.  Diehl attests that he has no knowledge or information of any kind regarding the "Spring Fresh" brand antiperspirant and deodorant containing any form of alcohol, and that were he to have such information, he would likely recommend that it be withdrawn and substituted with

8



another brand.  Diehl also notes that a number of common products for human use and consumption contain Propylene Glycol, which is used as a moisturizer in medicines, food, cosmetics, toothpaste, and mouthwash, as a medical lubricant, hand sanitizers and saline solutions, and in food colors and flavorings.  Diehl attests that he has no information to suggest that the presence of Propylene Glycol in the "Spring Fresh" antiperspirant and deodorant sticks presents any health or safety risks when used as directed by the manufacturer.  <u>See</u> <u>generally</u>, Diehl Affidavit.

The Defendant Benard McKie has also submitted an affidavit, wherein he attests that he is the Warden of the Kirkland Correctional Institute.  McKie attests that Plaintiff has a history of violent behavior within the South Carolina Department of Corrections, including assaults on staff, kidnaping, and rioting at other facilities.  McKie attests that he is not involved in the selection, assembly, or distribution of indigent inmate hygiene packages, nor did he select the toothpaste or antiperspirant/deodorant that Plaintiff is complaining about in this law suit.  McKie also attests that the "Spring Fresh" brand of toothpaste complained of by the Plaintiff was not on the FDA advisory listing at issue, that to his knowledge the Department of Corrections has never tested the "Spring Fresh" brand toothpaste for any chemical contamination, nor has he ever seen any test results or data to indicate that the toothpaste supplied to the Plaintiff contains any contamination.  As for the "Spring Fresh" antiperspirant/deodorant, McKie attests that he has no information that would lead him to believe that the presence of Propylene Glycol in that substance is any way abnormal or hazardous, and that Propylene Glycol is a common ingredient used in various brands of antiperspirants and deodorants and that to his knowledge is suitable for human use.  Further, the markings on the label of the "Spring Fresh" brand antiperspirant/deodorant states that it is "alcohol free".  Additionally,  since alcohol is contraband, McKie attests that if he had any information that led him to believe that the deodorant or any other product contained alcohol, he would attempt to

9



remove that product from the institution and substitute another product if possible.

With respect to Plaintiff's complaints about mold within the facility and in the hallways of the maximum security unit, McKie attests that he does not have any information to suggest that this claim is true. McKie attests that the MSU is thoroughly cleaned on a regular basis, with the floor being routinely mopped and the unit regularly inspected. Additionally, inmates housed in the MSU are regularly provided cleaning materials with which to clean their own cells, and they are expected to maintain a reasonable level of sanitation within their cells. McKie attests that inmates who fail to comply with this requirement are subject to disciplinary measures. McKie attests that the MSU is also regularly inspected by outside entities including the South Carolina Department of Health and Environmental Control (DHEC), and that he has never received any notice from DHEC that the MSU has an unhealthy or unacceptable level of mold, and in fact he believes that the MSU is clean, safe, and free of any unhealthy level of mold. McKie attests that if he was aware of any unsanitary conditions within the MSU, he would direct that it be thoroughly and completely cleaned and sanitized.

As for Plaintiff's complaint about a lack of sunlight, McKie attests that inmates housed in the MSU are the most aggressive inmates in the Department of Corrections with a proven history of disciplinary violations, assaults on staff, escapes, and other serious offenses. McKie attests that Plaintiff has a known history of assaulting staff, hostage taking, and rioting, among other crimes and disciplinary violations, and due to the extremely dangerous nature of inmates in the MSU, the facility is constructed in such a way as to try to minimize an inmate's ability to assault staff or other inmates, escape, or otherwise be a danger to inmates, staff, or the general public. McKie attests that the initial design of the facility had a small slip window approximately fourteen feet off the ground that allowed daylight into cells, but that even though this window was secured shut and had bars

10



designed to prevent escape, an inmate housed in the MSU penetrated this barrier using common items normally allowed within cells.  McKie attests that, due to this breech of security, a decision was made to eliminate this potential avenue for escape given the extreme danger posed by MSU inmates.  McKie attests that the most effective way to prevent another penetration of the windows was to weld them shut using steel plate, thereby making it impossible for another inmate to attempt to escape using this avenue, and that the welding shut of these windows serves a legitimate penalogical purpose by preventing the escape of inmates with a known history of violence and who present a very specific threat to the institution, staff, other inmates, and the general public.  McKie further attests that MSU inmates are not without opportunities for exposure to sunlight and fresh air, as the MSU has an open air outdoor recreational area that allows inmates to see the sky and outdoor environmental air, and that MSU inmates are allowed one hour in this recreation area every day except in cases of emergencies or other unforseen events.  McKie attests that while inmates are not required to go to the recreation area, they are offered this opportunity, and the Plaintiff's allegation that he does not have exposure to sunlight is therefore incorrect.

With respect to Plaintiff's complaints about the noise created by other inmates within the facility that is interfering with his sleep, McKie attests that the MSU houses the most disruptive and dangerous inmates within the Department of Corrections, and that these inmates are the worst of the worst and have a known history of disruptive and violent behavior.  McKie attests that inmates who have diagnosed mental health disorders are not housed in the MSU, however, but are transferred to another facility for confinement and treatment.  Further, the MSU facility was constructed in an effort to minimize the ability of inmates to communicate with each other from cell to cell in order to limit the ability of inmates to pass information between each other and to plan escapes, assaults, or other dangerous conspiracies, and as such the Department of Corrections has attempted to reduce

11



the amount of noise transmitted between cells. McKie attests that there is no way to completely isolate inmates from the noise generated within the facility, especially when inmates, including the Plaintiff, act out and intentionally try to disrupt the facility by creating a disturbance. While inmates who create disturbances are subject to charges for violations of disciplinary rules, under most circumstances there are few options available to actually calm or quiet an inmate who is intentionally attempting to disturb the institution. McKie attests that, in the event Plaintiff is having difficulty sleeping, he is able to request a medical examination and treatment for his alleged inability to sleep.

As for Plaintiff's complaint about being placed in a cell with twenty-four hour illumination, McKie attests that the MSU does have several cells that are used for twenty-four hour observation of inmates through the use of video cameras, and that these observation cells typically have constant illumination to allow for clear observation of the inmate. McKie attests that inmates are typically only placed in these cells when they have demonstrated a need for close observation through antisocial or suicidal behavior, and that while there may be some instances in which these cells will be used for other inmates when there is a shortage of available cells in the facility, these cells are never used in a punitive manner. McKie attests that if Plaintiff believes he is having trouble sleeping, he is free to request medical examination by the licensed medical personnel at the facility. See generally, McKie Affidavit.

The Defendant Robert Ward has also submitted an affidavit wherein he attests that he is the Director of Operations for the Department of Corrections. Ward attests that he is familiar with Plaintiff's inmate file and long history of violent behavior within the Department of Corrections. Ward attests that Plaintiff was initially incarcerated in February 1990 and is currently serving a sentence of 108 years. Further, while incarcerated, Plaintiff participated in a riot at the Broad River Correctional Institution where he took hostages and seriously assaulted staff, as a result of which

12



Plaintiff was convicted of three charges of hostage taking, two counts of assault and battery of a high and aggravated nature, and one count of assault and battery with intent to kill. Ward attest that, due to Plaintiff's violent and aggressive behavior, he was transferred to the Kirkland Correctional Institution's maximum security unit, which is designed to confine the most violent and dangerous inmates incarcerated within the Department. Ward attests that, due to the violent nature of the inmates housed in the MSU facility, special precautions must be taken to ensure that these inmates do not escape, assault staff, assault other inmates, or otherwise incite violence.

Ward confirms McKie's testimony concerning why the windows in the MSU have been sealed, and attests that, as a professional in the penalogical field, he believes that this measure was the most effective means of preventing another escape through the windows. Ward further attests to the same facts as McKie with respect to the lack of any mold problem within the MSU facility and the cleaning regimen provided in that facility, with respect to the providing of the "spring fresh" brand toothpaste and deodorant for inmates, and other matters as attested to by McKie. See generally, Ward Affidavit. The Defendant Gary Lane has also provided an affidavit attesting to these same facts. See generally, Lane Affidavit.

In opposition to the Defendants' argument and evidence, Plaintiff has submitted a sixty-one page memorandum, together with over two hundred pages of exhibits and affidavits.[4] Plaintiff's Exhibit A is a copy of an FDA report warning dated July 2007 about certain toothpaste manufactured in China. None of the listed products in this FDA advisory appear to include the

---

[4]One of the most litigious inmates in the South Carolina Department of Corrections system, Plaintiff has a history of flooding his files with motions, paperwork, and exhibits, a practice which he has continued in this case. Nevertheless, the undersigned has taken a considerable amount of time to go through the exhibits Plaintiff has filed in opposition to summary judgment in an effort to determine if he has any meritorious claims.

13



"spring fresh" toothpaste.  Plaintiff's Exhibit B is a letter to the Plaintiff from the U. S. Department of Health and Human Services dated October 31, 2008 confirming that, because Diethylene Glycol had been found to be contained in certain toothpaste imported from China, the Agency was warning consumers to avoid using tubes of toothpaste made in China.  Further, a recall was published in September 6, 2007, which, because of its manufacture in China, included the "Spring Fresh" toothpaste.  Plaintiff's Exhibit B 1 is a copy of the import alert dated October 17, 2007.  Plaintiff's Exhibit C is Request to Staff Member from the Plaintiff to the Defendant Ward dated June 6, 2007, complaining about the "Spring Fresh" toothpaste, and a response dated July 2, 2007, from the Defendant McKie stating that the toothpaste distributed by the Department of Corrections was not on the list of brands identified by the FDA as being a toothpaste from China containing DEG (Diethylene Glycol or Diglycol).

Plaintiff's Exhibit D are copies of inmate grievances filed by the Plaintiff on June 22, 2007 and July 9, 2007 wherein Plaintiff again complains about the distribution of the "Spring Fresh" toothpaste.  The response to these grievances states that the "Commissary Branch Chief has advised Ms. Peck that the toothpaste that SCDC is issuing to inmates were not included on the contamination list.  Based on this information your requested action is denied at this level."  Plaintiff's Exhibit D-1 is a copy of a purchase order from American Amenities, Inc., showing the purchase by the Department of Corrections of a quantity of "Spring Fresh" stick deodorant and toothpaste, dated August 28, 2008.

Defendant's Exhibit E is a copy of answers to interrogatories provided by American Amenities, Inc.  With respect to Plaintiff's claims, American Amenities states in these interrogatories that it is informed and believes that the Spring Fresh deodorant product referred to by the Plaintiff in this lawsuit contains no alcohol, and that the company has no knowledge concerning the presence

14



of Diethylene Glycol in any toothpaste that Plaintiff has used.  American Amenities also responds that, as of the date of its interrogatory answers (August 29, 2008), it continues to sell and distribute products to the South Carolina Department of Corrections, some of which are manufactured in China, and that it has not received any direct communications from the FDA or any other governmental agency concerning its toothpaste product.  Plaintiff's Exhibit F is a copy of answers to requests to admit by American Amenities and its CEO, wherein the company admits that it was aware of the notice issued by the FDA concerning products manufactured in China possibly containing DEG, and that the "Spring Fresh" toothpaste and deodorant are manufactured in China.  The company denies that the "Spring Fresh" deodorant contains alcohol, admitted that the company conducted an investigation into allegations of the "Spring Fresh" toothpaste containing Diethylene Glycol, and admitted that it informed the South Carolina Department of Corrections that an unknown number of tubes of "Spring Fresh" were found to contain an unknown quantity of Diethylene Glycol.  The company also admits that prior to the June 1, 2007 FDA warning, it had no knowledge regarding toothpaste made in China possibly containing Diethylene Glycol.

Plaintiff's Exhibit G is a response of the Defendants (except for the Defendant Mills), wherein these Defendants state in response to interrogatories that, in response to a complaint from the Plaintiff the Department inquired of its supplier regarding the "Spring Fresh" toothpaste and was advised by the supplier that the toothpaste did not contain any contamination with Diethylene Glycol. The Department also obtained copies of the FDA notices posted on the FDA website, which did not list the "Spring Fresh" toothpaste as being among those found to have been contaminated.  The Department further states that it has not received any notice from any governmental entity (Defendants' responses are dated July 18, 2008) that has identified the toothpaste at issue in this litigation as being known to contain Diethylene Glycol, but that the Department of Corrections has

15



not conducted any scientific testing on the toothpaste product, nor has the Department been made aware of any scientific testing that has found the toothpaste at issue to be contaminated with Diethylene Glycol.  Defendants further state that the Department has subsequently learned that the "Spring Fresh" toothpaste at issue in this litigation may have been tested by American Amenities, and that upon information and belief that testing found an unknown number of tubes to be contaminated with an unknown quantity of Diethylene Glycol.  Defendants attest that they had no knowledge of any notification from American Amenities regarding this testing, and in fact have previously received assurances from American Amenities that the toothpaste was free of Diethylene Glycol.  As far as Propylene Glycol being present in the deodorant at issue, Defendants respond that the Department is not aware of any notice or warning regarding those products and that Propylene Glycol was a common ingredient in deodorant products as well as a number of other human consumables.  The Defendant Peck responds to an interrogatory by stating that the Department of Corrections still makes available to the inmate population various products marked as products from China.

Plaintiff's Exhibit H is a copy of some sick call requests from May, August and September 2007 wherein Plaintiff is requesting to be seen by medical for complaints of problems with his gums from using the toothpaste at issue and rashes from using the deodorant at issue.  These request forms indicate that Plaintiff was scheduled to be seen, and received some form of cream (apparently for use on his rash).[5]

Plaintiff's Exhibit I are copies of his medical records, reflecting the Plaintiff was seen by the prison health services on numerous occasions for various complaints, including some of the

---

[5]Some other sick call requests were also included with this Exhibit, but they do not pertain to the claims remaining at issue in this case.



complaints remaining at issue in this lawsuit.  These records reflect that Plaintiff received varying treatments for his complaints, including creams for complaints of rashes and percogesic for complaints that his head hurt from using the cited toothpaste.  Plaintiff also complains on various occasions about problems sleeping, and is prescribed various medications including percogesic and Tylenol.  In a treatment noted dated August 14, 2007, Plaintiff complains of swelling on the left side of his face and a tingling sensation after brushing his teeth.  However, upon examination Plaintiff's face was found to be symmetrical with no swelling, there was no swelling or open areas in his mouth, no lesions, and his tongue was also free of lesions or swelling.  It was noted that Plaintiff had a possible cavity on a lower molar.

Plaintiff's Exhibit J is a copy of a bid award statement dated January 26, 2006 noting that American Amenities was one of the companies being awarded a bid from the Department of Corrections.

Plaintiff's Exhibit K is a copy of a SCDC policy/Procedure for the maximum security unit, effective November 1, 2006.

Plaintiff's Exhibit L is a study (apparently obtained by Plaintiff off the internet) from "Mercola.com" (apparently published by a "Dr. Mercola"), wherein this individual discusses a possible link between night light exposure and cancer.  This publication states, in part, that night lights suppress the body's production of melatonin, and can therefore increase a person's risk of cancer related mutations.

Plaintiff's Exhibit L-1 is a copy of a letter to another inmate in the Kirkland MSU from a Dr. William Hrushesky, who also states that there is a connection between light exposure at night and an increased risk for a wide variety of illnesses, and that the best way to prevent these problems is to have at least eight hours of uninterrupted nocturnal darkness each night and have

17



regular schedules of sleep.

Plaintiff's Exhibit M contains is a copy of an inmate grievance filed by another inmate.

Plaintiff's Exhibit 1 is copy of a Request to Staff Member relating to a number of matters, including some of the matters remaining at issue in this lawsuit. Plaintiff has also included a copy of a newspaper article concerning complaints by "an inmate" in the Kirkland MSU complaining about various conditions of confinement.

Plaintiff has also submitted an affidavit wherein he reiterates many of the statements and allegations already made in his verified complaint. Plaintiff further attests that the Defendants continue to purchase the "Spring Fresh" toothpaste and deodorant for distribution to inmates, as is shown by the purchase order of August 28, 2008. Plaintiff also discusses the opinions from his two medical exhibits about exposure to night lights. See generally, Plaintiff's Affidavit.[6]

Plaintiff has also provided some unverified statements from other prison inmates, listed as "Affidavits", wherein these inmates complain of medical problems they attribute to use of "Spring Fresh" hygiene products. These inmates also complain about the banging and loud screaming of allegedly mentally ill prisoners, the lack of exposure to sunlight in their cells, and other general conditions in the Kirkland MSU. See generally, Prisoner Statements.

### Discussion

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers

---

[6]Plaintiff also sets forth numerous legal arguments and conclusions in this Affidavit, such as that the Defendants knowingly provided contaminated hygiene product to prisons. Such assertions are not "facts" and therefore have not been considered as evidence for purposes of the summary judgment motions. See Wachovia Bank, N. A. V. Federal Reserve Bank of Richmond, 338 F.3d 318, 323 n. 5 (4th Cir. 2003)[Affidavit unsupported by evidence and amounting to nothing more than a legal conclusion carries no weight for purposes of a summary judgment motion].



to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P. Further, while the Federal Court is charged with liberally construing a complaint filed by a <u>pro se</u> litigant to allow the development of a potentially meritorious case, <u>see</u> <u>Cruz v. Beto</u>, 405 U.S. 319 (1972); <u>Haines v. Kerner</u>, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. <u>Weller v. Dep't of Social Services</u>, 901 F.2d 387 (4th Cir. 1990).

## I.
### (Toothpaste/Deodorant Claim)

After careful review and consideration of Plaintiff's claims and evidence concerning the "Spring Fresh" toothpaste and deodorant provided through the prison commissary, the undersigned does not find that a genuine issue of fact is presented as to whether Plaintiff's constitutional rights were violated by any named Defendant. The evidence before the Court, even Plaintiff's own evidence, clearly shows that prior to June/July 2007, no Defendant had any inkling that there may be a problem with hygiene products coming from China. Even after Plaintiff's complaint concerning these products, it is readily apparent that the Department of Corrections took affirmative steps to determine if the hygiene products being provided to inmates posed a danger; however, the ingredients listed on the product itself did not list the offending ingredient as being a part of that product, nor did the FDA circular discussing this issue list the "Spring Fresh" product as



being one of the products containing this ingredient or chemical. Further, Plaintiff has himself provided no evidence to show that the toothpaste at issue actually contains dangerous amounts or levels of DEG or any other offending ingredient, nor has Plaintiff provided any evidence to support his claim that the deodorant at issue contains a substance which includes alcohol, or that the substance at issue (Propylene Glycol) is in any way dangerous or defective. See Papasan v. Allain, 478 U.S. 265, 286 (1986)[Courts need not assume the truth of legal conclusions couched as factual allegations.]; House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993)[Plaintiff's conclusory allegations insufficient to maintain claim].

In order to show that any named Defendant violated his constitutional rights with respect to this claim, Plaintiff must show not only that the deprivation alleged was "objectively significantly serious", but that the Defendant acted with a "sufficiently culpable state of mind". See Shakka v. Smith, 71 F.3d 162,166 (4th Cir. 1995) [in order to state a constitutional violation, the deprivation alleged must not only be "objectively significantly serious", but the Defendant must also have acted with a "sufficiently culpable state of mind"]; Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998), (citing Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996)); see also Farmer v. Brennan, 114 S.Ct. 1970, 1979 (1994) [A defendant must have engaged in conduct "for the very purpose of causing harm or with the knowledge that harm [would] result"]; Pruitt v. Moore, No. 02-395, 2003 WL 23851094 at *9 (D.S.C. July 7, 2003) [only deliberate or callous indifference on the part of prison officials to a specific known risk of harm states on Eighth Amendment claim], cert. denied, 2004 WL 232748 (4th Cir. 2004); Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997) ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"]. Plaintiff has failed to present any such evidence, and indeed his own evidence refutes his claim that any named

20



Defendant was deliberately indifferent to the potential danger posed by hygiene products from China, or alternatively that any risk being imposed through the use of "Spring Fresh" hygiene products at the prison was "objectively significantly serious". Even assuming for purposes of summary judgment that an inference can be derived from Plaintiff's exhibits that some tubes of "Spring Fresh" toothpaste may contain some amount of DEG and that the Department of Corrections is still providing "Spring Fresh" toothpaste and deodorant to inmates, the fact remains that Plaintiff has not submitted any *evidence* to show that there is anything dangerous in or about these products. Plaintiff's most recent FDA exhibit, wherein all products from China are re-called, still fails to identify the "Spring Fresh" toothpaste product as containing improper or dangerous levels of DEG or any other contaminate, nor is there any evidence to show that the Propylene Glycol contained in the "Spring Fresh" deodorant is either alcohol based or dangerous.

       Further, Plaintiff has also failed to show that he has suffered any injury whatsoever as a result of his use of these products. see Thaddeus-X v. Wozniak, No. 99-1720, 2000 WL 712383 at **3 (6th Cir. May 23, 2000)[Plaintiff must show he suffered more than de minimis injury]; Harper v. Showers, 174 F.3d 716, 719 (5th Cir. 1999)[Without proof of more than de minimis physical injury, Plaintiff cannot maintain his claim]. Not only have the Defendants submitted medical evidence, including testimony from a licensed physician, that Plaintiff has suffered no harm from the use of these products, but Plaintiff's own medical evidence (specifically, Plaintiff's own medical records) fail to support his allegations. While these medical records certainly reflect that Plaintiff *complained* about problems with his gums and about rashes, they fail to reflect any objective findings with respect to his complaints deriving from use of the toothpaste, or to show that any rash he was suffering constituted a serious medical condition, or that any such rash was even caused by the deodorant he was using. See Court Docket No. 166-3; Plaintiff's Exhibits H & I. While Plaintiff



may not agree with these medical findings, he cannot simply allege in a conclusory fashion that he has been harmed by the cited products, otherwise provide no supporting evidence, and expect to survive summary judgment. Papasan, 478 U.S. 265, 286 (1986) [Courts need not assume the truth of legal conclusions couched as factual allegations]; Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; see Scheckells v. Goord, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006) (citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical fitness, whether physical or mental; that is what independent medical experts are for."]; see also Green v. Senkowski, 100 Fed.Appx. 45 (2d Cir. 2004) (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence, and contrary to the medical evidence on record, insufficient to defeat summary judgment on deliberate indifference claim].

This claim should be dismissed.

## II.
### (Remaining Claims)

The remainder of Plaintiff's assertions are essentially a hodgepodge of varying conclusory claims and allegations. Indeed, they mirror the types of claims Plaintiff has asserted in many of his previous court actions. However, Plaintiff has failed to present any evidence to establish an Eighth Amendment conditions of confinement claim with respect to these issues. See generally, Stricker v. Waters, 989 F.2d 1375, 1379, 1381 (4th Cir. 1993), cert. denied, 510 U.S. 949 (1993); Shakka, 71 F.3d at 166. During the time period set forth in the Complaint, Plaintiff was an inmate in a correctional facility, not a hotel, and it should be expected that conditions in such a setting are oftentimes less than ideal. Lunsford v. Bennett, 17 F.3d 1574, 1581 (7th Cir. 1994); Hadley v.

22



<u>Peters</u>, No. 94-1207, 1995 WL 675990 *8 (7th Cir. 1995), <u>cert.</u> <u>denied</u>, 116 S.Ct. 1333 (1996)

["prisons are not required to provide and prisoners cannot expect the services of a good hotel."]

(quoting <u>Harris v. Fleming</u>, 839 F.2d 1232, 1235 (7th Cir. 1988)). <u>See also</u> <u>Smith v. Bessinger</u>, C/A

No. 0:96-2217-23BD [Report and Recommendation].  Further, through his own actions, Plaintiff has

placed himself in the maximum security unit of the prison, where he is by necessity subjected to even

more stringent restrictions and conditions of confinement.

        With respect to Plaintiff's complaint about noise in the MSU, Plaintiff has failed to

provide any specifics or evidence to support this general and conclusory claim, or to show that the

noise levels in the MSU during his period of incarceration there was such as to violate his

constitutional rights.  As previously noted, only extreme deprivations satisfy the objective component

of an Eighth Amendment claim.  <u>Shakka</u>, 71 F.3d at 162, 166.  Plaintiff cannot simply state that the

noise level in the MSU is of a magnitude to amount to a constitutional violation, provide no evidence

of the actual noise level to which he is being subjected or how long these periods of allegedly

extensive noise last, and expect to survive summary judgment on this claim.  <u>See</u> <u>Rish v. Johnson</u>,

131 F.3d 1092, 1096 (4th Cir. 1997) ["only extreme deprivations are adequate to satisfy the objective

component of an Eighth Amendment claim regarding conditions of confinement"]; <u>Bagola v. Kindt</u>,

131 F.3d 632, 646 (7th Cir. 1997) ["Although prison officials need not intend that a known risk will

actually harm an inmate, they must intentionally ignore this known risk in order to be liable under

the Eighth Amendment."]; <u>cf.</u> <u>Lunsford v. Bennett</u>, 17 F.3d 1574, 1580 (7th Cir. 1994) ["Subjecting

a prisoner to a few hours of periodic loud noises that merely annoy, rather then injure the prisoner

does not demonstrate a disregard for the prisoner's welfare."]; <u>Ajaj v. United States</u>, 479 F.Supp. 2d

501, 511 (D.S.C. 2007) [finding that "[w]hile plaintiff's evidence is sufficient to suggest that the

noise level was unpleasant and annoying, it is not sufficient to establish either a constitutional or

23



negligence claim"]; cf. Levy, 1997 WL 112833 ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"] (quoting Farmer, 511 U.S. at 837).

Cell illumination, particularly where it involves maximum security inmates whose movement and conduct need to be monitored, has also been found to pass constitutional muster. See generally Sweet v. South Carolina Department of Corrections, 529 F.2d 854, 859 (4th Cir. 1975) (en banc) [describing federal court's deference to prison administrators and all administrative matters unless the condition rises to the level of a constitutional violation]. As long as restrictions or regulations placed on MSU inmates are reasonably related to a legitimate penalogical objective, they should be upheld by the courts; Turner v. Safley, 482 U.S. 78, 89 (1987) ["...when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penalogical interests"]; and the burden is on the prisoner to disprove the validity of the prison regulation at issue. Overton v. Bazzetta, 539 U.S. 126, 132 (2003). Here, Plaintiff has failed to show that the policy regarding cell illumination is not reasonably related to legitimate penalogical interests under the standard of Turner and its progeny. Further, Plaintiff's medical records failed to support his claim that he is suffering from any serious medical condition as a result of sleep deprivation, fatigue, or related ailments. Strickler, 989 F.2d 1375, 1381 ["In order to withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions]; Shakka, 71 F.3d 162, 166 ["In the context of a conditions-of-confinement claim, to demonstrate that a deprivation is extreme enough to satisfy the objective component of an Eighth Amendment claim, a prisoner must 'produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions', or demonstrate a substantial risk of such

24



serious harm resulting from the prisoner's unwilling exposure to the challenged conditions"].

As for lack of sunlight, while Plaintiff has presented two exhibits which discuss the value of sunlight and how long-term exposure to interior lighting could result in health problems, his own medical records fail to substantiate that he is suffering from any such problems, nor has he provided any other medical evidence to show that he is suffering any ill effects due to a short term exposure to twenty-four hour interior lighting. Chavarria v. Stacks, 102 Fed.Appx. 422, 436-437 (5th Cir. July 20, 2004)[policy of constant illumination was reasonably related to the legitimate penalogical interest of guard security and enforcement of the policy did not violate the Eighth Amendment]; Murray v. Edward's County Sheriff's Department, 248 Fed.Appx. 993, 998-999 (10th Cir. Oct. 1, 2007)[upholding summary judgment for Defendant jail officials on grounds that detainee had failed to establish that his sleep problems from continuous cell illumination were sufficiently severe to trigger the Eighth Amendment], cert. denied, _____ U.S. _____, 128 S.Ct. 2428 (2008); King v. Frank, 371 F.Supp. 2d 977, 984-985 (W.D.Wis. 2005). Further, as noted by the Defendants in their evidence, Plaintiff is able to go outside in the sunlight on a daily basis. Richard v. Reed, 49 F.Supp. 2d 485, 487 (E.D.V. 1999)[Temporary deprivation of sunlight not a sufficiently serious deprivation of a basic human need]; Keith v. Estelle Unit High Security Admin., No. 06-52, 2006 WL 3813771, *3 (S.D.Tx. 2006) "[[P]laintiff's deprivation of sunlight claim is meritless"]

Finally, as is the case with his other claims, Plaintiff has failed to present any evidence to substantiate his claim that there is excessive mold in the cells or hallways of the MSU, or that he is suffering from any medical condition as a result of mold being present. The Defendants have submitted evidence to show that the MSU is inspected regularly for cleanliness and that it is also routinely cleaned. Further, inmates themselves are provided with cleaning products that they can use



in their cells.[7]  Plaintiff cannot survive summary judgment on this claim where he has provided no evidence whatsoever to support it.  See Shrader v. White, 761 F.2d 975, 984 (4th Cir. 1985)[After considering attempts to regularly clean showers and no evidence of disease resulting from mold, the Court found the conditions did not constitute cruel and unusual punishment.]

### Conclusion

Based on the foregoing, it is recommended that the Defendants' pending motions for summary judgment be **granted**, that Plaintiff's motion for summary judgment be **denied**, and that this case be **dismissed** with prejudice.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

April 10, 2009

Charleston, South Carolina

---

[7]Defendants even note that among the allegations in Plaintiff's original complaint is that he received an injury from the use of cleaning solutions provided to him for the cleaning of his cell.  See Complaint, pp. 28-29 [Court Document 1, pp. 31-32.].

26



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail.  Fed. R. Civ. P. 6(a) & (e).  Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).

